## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                            CRIMINAL ACTION NO. 2:09-cr-00222

ERIC WAYNE LYTTLE,
JAMES EDWARD LYTTLE, and
DONALD L. MASSEY Jr.

        Defendants.

### MEMORANDUM OPINION

The purpose of this Memorandum Opinion is to set forth the Court's findings regarding the factual bases for the guilty pleas of Defendants Eric Wayne Lyttle, James Edward Lyttle, and Donald L. Massey Jr.

### *I. BACKGROUND AND PROCEDURAL HISTORY*

Defendants Eric Lyttle, James Lyttle, and Massey are among fifty-five members and associates of the Pagans Motorcycle Club (PMC) charged in a sweeping forty-four count indictment. A paired-down twenty-nine count superseding indictment was returned on February 2, 2010. These defendants were charged in the original indictment, and they each pled guilty to various subsections of 18 U.S.C. § 1959 ("VICAR").[1]

---

[1] James Lyttle originally pled guilty to 18 U.S.C. § 924(c), which charged him with carrying a firearm during the commission of a crime of violence. The Government recently filed a motion with the Court to schedule a second Rule 11 hearing for James Lyttle, this time to accept a plea of guilty to 18 U.S.C. § 1959(a)(4) and § 2. The Government's motion and the new plea agreement
(continued...)

Stipulations of fact were attached to each defendant's plea agreement for the purpose of establishing the factual basis for the offenses. Relying largely on the stipulation of facts, the Court found a basis in fact for the pleas of Eric Lyttle and Massey at the conclusion of their respective plea hearings in late 2009. Then, on December 4, 2009, Thomas Morris appeared before the Court to enter a guilty plea to Count Seven of the original indictment, which charged him with a separate VICAR offense. The Court expressed reservations at the hearing as to whether the elements of a VICAR offense were adequately supported by the stipulation of facts attached to Morris's plea agreement. Upon reviewing the proposed factual basis in greater detail after the plea hearing, the Court concluded that the stipulation expressly negated the intent element of the offense. The Court therefore rejected the guilty plea for lack of a factual basis. (Docket 840.) This troubling sequence, in combination with other factual basis concerns,[2] prompted the Court to review its factual basis findings for all defendants who had previously entered guilty pleas.

The Court has completed its review of the factual basis as to the three above-named defendants and hereby sets forth its findings for the record.

## II. DISCUSSION

*A. Background of the Offense*

The incident giving rise to the charges against defendants Eric Lyttle, James Lyttle, and Massey is described in the defendants' stipulations of fact and was the subject of an evidentiary

---

[1](...continued)
contemplate dismissal of the firearm charge to which James Lyttle originally pled.

[2] For example, in March 2010, the Court refused to accept Defendant Joseph Schmidt's plea of guilty to Count Eleven of the superseding indictment. Defendant Schmidt disavowed the contents of his stipulation and sought to withdraw his guilty plea.

hearing held on June 17, 2010. The evidence in the record tells the following story. The defendants are members of the Last Rebels Motorcycle Club (LRMC). The LRMC is a support club for the PMC. Support clubs are motorcycle clubs operating within the PMC's territory with the PMC's permission. As a support club, the LRMC is obligated to perform any task assigned by the PMC, even if that task involves engaging in unlawful activity. Sometime in April of 2008, PMC national vice president Floyd Moore issued orders to the LRMC that they were to shut down a small motorcycle riding group called Next to Kin. The Next to Kin had been formed by several motorcycle enthusiasts as a "family-oriented riding group" for the purpose of going on rides together. Its membership consisted of two married couples and three of their friends. The teenage son of one of the couples had designed a logo for the group, and the members ordered custom-made vests with the logos. The Next to Kin's offense against the PMC was not obtaining proper permission to form a motorcycle club in PMC territory.

The LRMC discussed Moore's orders at their next weekly meeting on April 5, 2008. Orders were given to the LRMC's members that they were to be on the lookout for the Next to Kin. If they encountered the Next to Kin on the roads, they were to "take their patches"—that is, strip them of any insignia of the club and order them to dissolve the club. These orders were included in the minutes for the meeting.

Shortly thereafter, both Lyttles and Massey, accompanied by Anthony Peters and Jeffrey Jett,[3] were out riding their motorcycles in Racine, West Virginia. The specific purpose of the excursion that day was clearly something other than seeking out the Next to Kin club, and may have

---

[3] Defendants Jett and Peters entered Pretrial Diversion Agreements with the Government before the Court on November 4, 2010.

been to visit the grave site of James Lyttle's mother. The LRMC members spotted several motorcyclists pulled over in a supermarket parking lot. Thinking they were other LRMC members, the group headed towards the other motorcyclists. There they encountered four members of the Next to Kin—the two couples—waiting for two other people who would be joining them for a motorcycle ride.

Eric Lyttle, who is known as "Tree" due to his towering stature, dismounted his motorcycle and demanded that one of the Next to Kin members, Scott Smith, come speak to him. Peters and James Lyttle were standing near Eric Lyttle. Peters admitted that he assumed a threatening posture, and Scott Smith observed that James Lyttle was carrying a firearm. Jett was nearby, but he did not dismount his motorcycle. Jett and Peters admitted that their role in the incident was to be part of a show of force. Massey stood behind Scott Smith's wife, April Smith, taunting the group. According to the testimony of April Smith and Eric Lyttle, Massey was asking the Next to Kin members if they "wanted to start something" and telling them that he "ain't scared to whoop nobody." Eric Lyttle demanded that the Next to Kin turn over their vests to him. Eric Lyttle testified that he gave Scott Smith an ultimatum: he could turn over the Next to Kin vests on the spot or Lyttle would tell the Pagans and the Next to Kin members would "have hell to pay." April Smith approached Eric Lyttle and her husband. Scott Smith told her to hand over her vest to Lyttle. He then told her to call the police. Eric Lyttle warned him, "That would be the worst thing you could do." Scott Smith then directed the other couple to hand over their vests to Eric Lyttle. With vests in hand, the LRMC members left. The incident was memorialized in the minutes of the LRMC's April 19, 2008, chapter meeting.

Eric Lyttle, James Lyttle, Massey, Jett, and Peters all were charged with offenses in connection with the confrontation with the Next to Kin. Eric and James Lyttle and Massey pled guilty to Count Ten of the original indictment, which charged them with threatening to commit a crime of violence, or aiding and abetting the same, in violation of 18 U.S.C. § 1959(a)(4) ("VICAR") and § 2. The predicate crime of violence is cited as W. Va. Code § 61-2-9.

### B. *Substantive VICAR Offense*

The guilty pleas of Eric Lyttle, James Lyttle, and Massey are contingent upon it being established that at least one of their number committed the substantive offense of threatening to commit a crime of violence in aid of racketeering. Upon that finding, the criminal liability of the other defendants who pled to Count Ten is established only if they acted in some way to aid and abet the threat of violence.

To establish the substantive offense of threatening to commit a crime of violence in aid of racketeering in violation of 18 U.S.C. § 1959(a)(4), the Government must prove the following five elements: (1) that the PMC and its support clubs constituted an enterprise; (2) that the enterprise was engaged in racketeering activity; (3) that the defendants had a position in the enterprise; (4) that the defendants threatened the alleged crime of violence, namely, battery in violation of W. Va. Code § 61-2-9(c); and (5) that their general purpose in so doing was to maintain or increase their position in the enterprise. *See United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994).

Not all of the elements are in question. The Court has previously found that the PMC and its support clubs constitute an enterprise as that term is defined in 18 U.S.C. § 1959(b)(2). It is clear that the defendants here had a position in that enterprise. They all freely admit that the LRMC was a support club for the PMC and that they were members in good standing of the LRMC. There

likewise is little doubt that the defendants' actions on that April morning were motivated by the desire to maintain their positions in the enterprise. The orders were issued directly from the PMC's national vice president. The defendants' membership and standing in the LRMC were dependant on the fulfillment of that order.

The two remaining VICAR elements at issue are the second and the fourth—that the enterprise was engaged in racketeering activity and that the defendants threatened to commit a crime of violence. Each element will be discussed in greater detail.

### 1. *Enterprise engaged in racketeering activity*

The Government must prove the following to establish VICAR's "enterprise engaged in racketeering activity" element: (1) that there was a present and ongoing threat that the enterprise would commit racketeering acts through its members; (2) that the threat arose from one or more racketeering acts committed by a member of the enterprise on behalf of the enterprise; and (3) that the threat was existent at the time the predicate crime of violence was committed or threatened. *Barbeito*, 2010 WL 2243878, at *17, 2010 U.S. Dist. LEXIS 55688, at *58–59. Racketeering activity is defined as either "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical, . . . which is chargeable under State law and punishable by imprisonment for more than one year," or "any act which is indictable" under any of an extensive list of federal offenses. 18 U.S.C. § 1961(1).

There are numerous examples of racketeering activity alleged to have been committed by PMC members or associates on behalf of the enterprise. Defendants Jett and Peters have stipulated

to at least three such acts. The Court may base its factual basis finding on any evidence in the record, *United States v. Mastrapa*, 509 F.3d 652, 660 (4th Cir. 2007).

The first example of racketeering activity involves an incident that occurred in Portsmouth, Ohio, in November of 2004. According to co-Defendant David Cremeans's stipulation of facts and facts proffered at a hearing held on June 22, 2010, one of the the PMC's support clubs, the Road Disciples Motorcycle Club (RDMC), was not satisfactorily fulfilling its obligations to the PMC. PMC vice president Floyd Moore ordered West Virginia-based members of the PMC and the LRMC to confront the RDMC members at their clubhouse in Portsmouth, Ohio. The assembled PMC and LRMC members traveled to Portsmouth in several vehicles. A number of them were armed with axe handles, at least one of them carried a knife, and one of them possessed a handgun. When they arrived, the PMC and LRMC members entered the RDMC clubhouse in a show of force. The RDMC members were presented with an ultimatum: they could agree to fulfill their support club obligations, relinquish their "16" patches, or risk a violent melee. Fearing violence, the RDMC members turned over their "16" patches.

Robbery is a racketeering activity, as that term is defined in 18 U.S.C. § 1961(1). Ohio Rev. Code Ann. § 2911.02 is Ohio's robbery statute. It states, in part:

> (A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
> (1) Have a deadly weapon on or about the offender's person or under the offender's control;
> (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;
> (3) Use or threaten the immediate use of force against another.

Ohio Rev. Code Ann. § 2911.02. Numerous crimes qualify as theft offenses under Ohio law. Ohio Rev. Code Ann. § 2913.01. The most appropriate theft offense under the present facts appears to

7

be Ohio Rev. Code Ann. § 2913.02, which provides: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: . . . By threat; . . . [or] By intimidation."

The record is sufficient to establish that PMC members engaged in a robbery under Ohio law. The RDMC were deprived of property, namely their "16" patches. They turned over the patches in response to intimidation and implicit, if not explicit, threats of violence. Such acts constitute a theft offense under Ohio Rev. Code Ann. § 2913.02.[4] The theft offense is elevated to robbery because one of the PMC members possessed a knife and another possessed a firearm during the incident. It is immaterial that the victims may not have been aware of the weapons because Ohio's robbery statute requires only that a deadly weapon be under the perpetrator's control during the commission of a theft offense. Ohio Rev. Code Ann. § 2911.02(A)(1). Further, the weapon need not be used, displayed, or brandished. *State v. Wharf*, 715 N.E.2d 172, 175 (Ohio 1999) (discussing Ohio Rev. Code Ann. § 2911.02(A)(1)). Robbery is a felony under Ohio law punishable by more than one year in prison. Thus, it qualifies as a racketeering activity under VICAR. *See* 18 U.S.C. § 1961(1) ("'racketeering activity' means . . . any act or threat involving . . . robbery . . . which is chargeable under State law and punishable by imprisonment for more than one year . . . ."). In addition, the robbery episode represents a continuing threat directed to the RDMC and other support clubs in the PMC's territory, the message of which is that the PMC will maintain control of its support clubs through violence and intimidation. The Racine incident, which is very similar in many ways to the Portsmouth incident, further supports the notion of this continuing threat.

---

[4] It is of no moment that the patches may have had little monetary value because Ohio Rev. Code Ann. § 2913.02 "defines theft without reference to value." *State v. Smith*, 905 N.E.2d 151, 152 (Ohio 2009).

A second racketeering act is a conspiracy to commit murder in violation of W. Va. Code § 61-10-31 and § 61-2-1. Murder is racketeering activity as defined by 18 U.S.C. § 1961(1). Consonant with the expansive language of § 1961(1),[5] conspiracy may properly be alleged as a predicate racketeering act when it involves any of the substantive offenses included within the definition of racketeering activity. *E.g.*, *United States v. Licavoli*, 725 F.2d 1040, 1045 (6th Cir. 1984) ("[R]acketeering activity includes 'any act or threat involving' the substantive crime, 'chargeable under state law and punishable by imprisonment for more than one year. . . . We see no indication that Congress intended conspiracy to commit murder not to be a predicate act under section 1961(1)(A) . . . ."); *United States v. Welch*, 656 F.2d 1039, 1063 n.32 (5th Cir. 1981), *cert. denied*, 456 U.S. 915 (1982).

The factual basis for this incident is discussed in signed stipulations of facts from Floyd Moore and Thomas Morris, both of whom have pled guilty to offenses in this case. The conspiracy lasted from approximately May of 2006 to March of 2007. The conspiracy involved Morris, who was the president of the Red House, West Virginia, chapter of the Avengers Motorcycle Club, and Moore, who was the PMC national vice president. The Avengers had reached a detente with the PMC. They were not a support club of the PMC, but they were permitted to operate an independent

---

[5] Section 1961(1) includes "any act or threat *involving* murder" in the definition of a racketeering activity, which firmly contemplates a conspiracy to commit murder. 18 U.S.C. § 1961(1) (emphasis added); *see also United States v. Welch*, 656 F.2d 1039, 1063 n.32 (5th Cir. 1981), *cert. denied*, 456 U.S. 915 (1982) ("The language of [18 U.S.C. § 1961] subsection [1]A itself which includes 'any act or threat involving murder' appears to contemplate a conspiracy to commit murder. A conspiracy to commit murder is an act involving murder."); *United States v. Pungitore*, 910 F.2d 1084, 1134 (3d Cir. 1990) (holding that, even though not expressly mentioned in 18 U.S.C. § 1961, conspiracy is a racketeering activity in light of the broad "involving" language of the statute); *United States v. Joseph*, 781 F.2d 549, 555 (6th Cir. 1986) ("Conspiracy to gamble [a racketeering activity listed in 18 U.S.C. § 1961(1)(A)] on its face falls within 18 U.S.C. § 1961(1)(A)'s definition of racketeering activity.").

quasi-outlaw motorcycle club in the PMC's territory nonetheless. Morris asked Moore for assistance killing a woman for personal reasons.[6] Moore volunteered the services of this personal sergeant-at-arms, Ronnie Howerton, to carry out the hit. The plot was stopped by law enforcement before its object was accomplished. According to the Government's undisputed proffer, Moore's participation in the conspiracy was an act on behalf of the PMC enterprise because it helped to maintain the PMC's control over its territory and influence over the Avengers. The threat of repeated incidents of racketeering activity was present so long as the Avengers and the PMC sought to maintain their uneasy relationship.[7] More broadly, this episode demonstrates the lengths to which the PMC would go to maintain its dominance over territory and other motorcycle clubs. There is no indication that this threat had abated at the time of the Racine incident.

Another racketeering act that may be found in the record was a conspiracy to retaliate against a witness in violation of 18 U.S.C. § 1513(f).[8] This offense is included in the list of federal offenses

---

[6] The Court rejected Morris's proposed guilty plea to a VICAR offense based on the facts outlined here. Morris's motivations were personal and in no way related to the enterprise, which negated the mens rea element of the VICAR charge. Morris later pled guilty to an information charging him with a VICAR offense stemming from a different incident, as discussed *infra*.

[7] This conclusion is borne out by the facts underpinning Morris's second guilty plea. Shortly after the murder conspiracy ended, in June of 2007, a man known to Moore broke into his home at night and violently assaulted Moore and his girlfriend. Moore issued orders that the man was to be found and forcibly returned to him so that he could exact revenge for the assault. Morris responded by ordering members of the Avengers to be on the lookout for the man and to restrain him if found.

[8] Section 1513, in its entirety, is expressly listed in the definition of "racketeering activity," as set forth in 18 U.S.C. § 1961(1)(B). Furthermore, § 1961(1)(B) refers to a slew of criminal statutes included in defining "racketeering activity," but it broadly proclaims that "racketeering activity" includes *any act which is indictable under* of the listed sections. Incorporated in that list is 18 U.S.C § 1513, which is described as "relating to retaliating against a witness, victim, or an informant." 18 U.S.C. § 1961(1)(B). Not only is 18 U.S.C. § 1513(f), conspiracy to retaliate, specifically listed in the definition of racketeering activity, it is also covered by the plain language of § 1961(1)(B) because it is an "act which is indictable under . . . section 1513 [which relates to] tampering with a
(continued...)

qualifying as racketeering activity. 18 U.S.C. § 1961(1). In that conspiracy, the Government alleged that several members of the LRMC conspired in late 2005 to assault a PMC member incarcerated at the Federal Correctional Institution in Ashland, Kentucky (FCI Ashland). The intended victim had cooperated with law enforcement officers in the prosecution of his co-defendant, who also was a PMC member, in a federal bank robbery case. Floyd Moore authorized the assault, which was facilitated by a corrections officer at FCI Ashland, Michael Stevens. Stevens was convicted by a jury for his role in the conspiracy. This plot was found by the Court to be part of the factual basis, as racketeering activity, for the guilty plea of co-Defendant David Cremeans.

The FCI Ashland plot furthered the PMC's goals—as proffered by the Government—of protecting its unlawful activities through violence and intimidation. More specifically, the plot, if it had succeeded, would have sent a message to others that persons who provide information about the PMC to law enforcement do so at their own peril. The threat of similar acts of violence remained present so long as the PMC maintained the practice of punishing and intimidating persons

---

[8](...continued)
witness, victim, or an informant." *See also Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997) (referring to 18 U.S.C. § 1951 (extortion), which is also a listed statute in 18 U.S.C. § 1961(1)(B), and stating "[e]xtortion, attempted extortion, and conspiracy to extort under the Hobbs Act are explicitly identified as requisite predicate acts under § 1961."); *accord Ne. Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1350 (3d Cir. 1989) (attempted extortion and conspiracy to commit extortion are crimes under 18 U.S.C. § 1951, a statute enumerated in 18 U.S.C. § 1961(1)(B), and "any act which is indictable under [a listed section]" is a racketeering act); *United States v. Livacoli*, 725 F.2d 1040, 1045 n.6 (6th Cir. 1984) ("Conspiracies or attempts can serve as the underlying racketeering activities because 18 U.S.C. § 1961(1)(B) defines 'racketeering activity' as including those offenses indictable under 18 U.S.C. § 1951. Section 1951, in turn, makes punishable attempts or conspiracies to obstruct, delay, or affect commerce by robbery, extortion, or physical violence." (quoting *United States v. Brooklier*, 685 F.2d 1208, 1216 (9th Cir. 1982))). Just like the Hobbs Act, 18 U.S.C. § 1951, the witness retaliation statute makes punishable a conspiracy to retaliate, and therefore brings conspiracy to retaliate within the purview of 18 U.S.C. § 1961(1)(B).

who cooperate with the law enforcement against members of the PMC. There has been plenty of evidence in this case that "rats" are not tolerated in the PMC enterprise. The record supports the conclusion that this threat was present at the time of the incident in Racine.

The evidence in the record indicates that the PMC and its support clubs were engaged in several forms of racketeering activity during the time period relevant to the instant offense. Accordingly, the Court finds that there is a sufficient basis in fact for the conclusion that the PMC and its support clubs constituted an enterprise engaged in racketeering activity at the time the defendants' confronted the Next to Kin members.

### 2. *Threat to commit a crime of violence*

To establish a factual basis for a VICAR threat of violence, the Government must demonstrate that at least one of the LRMC members threatened a crime of violence against one of the Next to Kin. Courts construing statutes analogous to § 1959(a)(4) provide guidance for distinguishing "true threats" from lawful communications. Statements may be considered true threats if "an ordinary reasonable recipient who is familiar with the[ir] context . . . would interpret [those statements] as a threat of injury." *United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009) (quoting *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990)) (interpreting 18 U.S.C. § 115, which prohibits threats to assault Federal officials); *see also Watts v. United States*, 394 U.S. 705, 707–08 (construing 18 U.S.C. § 871, which prohibits threats against the President). True threats need not be explicit or direct, so long as the person receiving the communication reasonably understands its threatening meaning. *See, e.g., United States v. Napa*, 370 F. App'x 402 (4th Cir. 2010) (unpublished) (finding email containing quotes from and references to Virginia Tech shooter, Seung-Hoi Chu, sent to survivors of attack to be threats); *United States v. Thai*, 29 F.3d 785, 819

12

(2d Cir. 1994) (construing demand for free beeper service as threat where previous unmet demand for free service resulted in robbery). Threats may be express or implied, including threats implied by actions or deeds. *See, e.g.*, *United States v. DiSalvo*, 34 F.3d 1204, 1212-13 (3d Cir. 1994) (violent reputation of crime organization, in conjunction with presence of several members, held sufficient as a threat under extortion statute); *United States v. Balzano*, 916 F.2d 1273, 1279, 1291 (7th Cir. 1990) (threat implied from motion of dragging finger across neck). For statutes criminalizing threats, it generally is immaterial whether the defendant actually intended to carry out the threat. *United States v. Darby*, 37 F.3d 1059, 1064 n.3 (4th Cir. 1994) (collecting cases interpreting various statutes prohibiting threats).

VICAR requires that the crime of violence threatened be unlawful under Federal law or the laws of the state in which the conduct occurred. The Government identifies the predicate crime of violence threatened as battery. Under West Virginia law, a battery has been committed "[i]f any person unlawfully and intentionally makes physical contact of an insulting or provoking nature with the person of another or unlawfully and intentionally causes physical harm to another person." W. Va. Code § 61-2-9(c). This Court previously has found that West Virginia's battery statute is a proper VICAR predicate crime of violence so long as the conduct is charged under the statute's second clause, as physical contact that unlawfully and intentionally causes physical harm to another person. *Barbeito*, 2010 WL 2243878, at *96‒99, 2010 U.S. Dist. LEXIS 55688, at *29‒30 (holding that batteries predicated on offensive or insulting touching are not "crimes of violence" for purposes of VICAR).

There is ample evidence in the record to conclude that the LRMC members threatened the Next to Kin members with physical harm during the encounter. The LRMC members' confrontation

with the Next to Kin members must be viewed in context. The Next to Kin members were familiar with the ways of PMC and LRMC. Scott Smith had declined an offer to join the LRMC, preferring to form his own family-oriented group instead. Smith had sought, and mistakenly believed he had obtained, permission from the PMC to form the group. Smith tried to argue this point with James Lyttle, who would hear none of it. Smith would not have sought permission from the PMC to form a riding group—an entirely lawful activity—unless he was aware that there were consequences associated with forming a group without the PMC's blessing. Smith therefore would have understood the reason the LRMC members were demanding the Next to Kin's vests and, presumably, the consequences of any refusal to comply with the demand.

It is in this context that five LRMC members descended on the four Next to Kin members, two men and two women. Eric Lyttle demanded that Scott Smith approach him. Lyttle was flanked by Peters and James Lyttle. James Lyttle's firearm was visible. Peters admitted that he assumed an intimidating and threatening posture. Although Jett did not dismount his motorcycle, he admitted displaying the same demeanor. With the LRMC members so assembled, Eric Lyttle demanded the vests. He informed Scott Smith if he refused, Lyttle would inform the PMC of the Next to Kin's obstinance. The import of this ultimatum was unmistakable under the circumstances: the Next to Kin would face violent reprisal from the PMC if the did not turn over their vests.

The threat of a future violence was present in Eric Lyttle's demands of the Next to Kin. However, that is not to say that there were not threats of more imminent assaults as well. During the encounter, Massey stood behind April Smith goading the Next to Kin members with taunts of "Do you want to start something?" and "I ain't scared to whoop nobody." When Scott Smith told April Smith to call the police, Eric Lyttle responded, "That would be the worst thing you could do."

The warning was sufficiently threatening to cause April Smith to refrain from calling the police. She testified that the words of Eric Lyttle, coupled with the positions and posture of the other LRMC members present, placed her in fear of an imminent violent assault.

Under the circumstances, and given April and Scott Smith's prior knowledge of the LRMC and PMC, they reasonably could have understood the LRMC members' actions that day to constitute true threats of physical harm. The causing of physical harm is battery under West Virginia law. Accordingly, there is a basis in fact to find that the LRMC members threatened the Next to Kin members with batteries.

### C. Aiding and Abetting VICAR Offense

To convict a defendant as an aider and abettor, it must be proven that someone committed the substantive offense. *United States v. Horton*, 921 F.2d 540, 543 (4th Cir. 1990) (discussing 18 U.S.C. § 2). The defendant will be liable as a principle even though his role in the crime was minor if he "knowingly associated himself with and participated in the criminal venture." *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) (quoting *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983). The defendant must have the specific intent to accomplish the purpose of the criminal undertaking he is aiding and abetting. *United States v. Gross*, 199 F. App'x 219, 235 (4th Cir. 2006) (unpublished).

There is a basis in fact for the guilty pleas of James Lyttle and Massey under an aiding and abetting theory. According to the LRMC minutes from their April 5, 2008, chapter meeting, Massey was present when the orders were given to shut down the Next to Kin. Massey admitted sharing the criminal purpose of stripping the Next to Kin members of their vests through intimidation and threats. Massey aided the threats directly by verbally taunting the Next to Kin members. James

15

Lyttle did the same by flanking his son, Eric Lyttle, thereby encouraging the argument and threatened hostilities by the other LRMC members. James Lyttle had received Floyd Moore's order regarding the Next to Kin and had instructed his own club accordingly. Moreover, it was James Lyttle who took custody of the Next to Kin colors at the close of the encounter. James Lyttle also admits to carrying a firearm during the encounter, which was displayed openly enough for several members of the Next to Kin to observe, whether intended or not.

While mere presence at the scene of a crime is not enough to establish that a criminal defendant aided or abetted a criminal venture, *United States v. Spoone*, 741 F.2d 680, 686 (4th Cir. 1984), in order to support a conviction for aiding and abetting, the government need only prove that a defendant participated at some stage of an illegal venture with knowledge of the result and the intent to bring about that result. *See United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007). James Lyttle's and Massey's actions aided the offense by demonstrating that the LRMC was capable of carrying out Eric Lyttle's threats if necessary. No more is required to be found liable as an aider and abettor. *See Burgos*, 94 F.3d at 873; *cf. United States v. Nelson*, 484 F.3d 257, 261 (4th Cir. 2007) (noting that defendants' pleas "constitute[] an admission of all material elements of the crime").

## III. CONCLUSION

For the reasons set forth above, the Court **FINDS** that there is a sufficient basis in fact for the guilty pleas of Defendants Eric Lyttle, James Lyttle, and Donald Massey, Jr.

The Court **DIRECTS** the Clerk to send a copy of this Order to Defendants and counsel, the United States Attorney, and the United States Probation Office.

ENTER:    December 15, 2010

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE